## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

VICTOR M. VEGA COLON,

    Plaintiff,

      v.

COLOMER & SUAREZ SAN JUAN, INC.

    Defendant.

CIV. NO. 18-1360 (MDM)

## OPINION AND ORDER

Plaintiff Victor M. Vega Colon ("Vega") brings this action against his former employer Colomer & Suarez ("Defendant" or "C&S") alleging discrimination, retaliation, and hostile work environment in violation of The Uniform Services Employment and Reemployment Rights Act ("USERRA,") 38 U.S.C. § 4311. Additionally, Vega claims that C&S unlawfully retaliated against, and terminated, him in violation of Puerto Rico Law 115 of December 20, 1991, P.R. Laws Ann. tit. 29, §§ 194 et seq. ("Law 115") and Puerto Rico Law No. 80 of May 30, 1976, P.R. Laws Ann. tit. 29 §§ 185a–185m ("Law 80,") respectively. Vega further claims that C&S failed to compensate him for overtime hours worked in violation of the Fair Labor Standards Act ("FLSA,") 29 U.S.C. § 201 *et seq,* and Puerto Rico Law No. 379 of May 15, 1948, 29 L.P.R.A. § 271 *et seq.* ("Law 379").

Presently before the Court is C&S' motion for summary judgment. (Docket No. 94-96). On its part, Vega filed a memorandum in opposition to C&S' motion. (Docket 133 and 133-1).[1] C&S then filed a reply to Vega's opposition. (Docket No. 144). In light of the findings of fact and legal discussion set forth below, the Court **GRANTS in part** and **DENIES in part** C&S' motion for summary judgment.

---

[1] With his opposition, Vega submitted his responses and objections to C&S' statement of material uncontested facts. Vega, however, did not file an opposing statement of material facts with his opposition, as it is required by Local Rule 56(c).

_____

## I.    Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see* Fed. R. Civ. P. 56(a). "An issue is genuine if 'it may reasonably be resolved in favor of either party' at trial, . . . and material if it 'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'" *Iverson v. City of Boston*, 452 F.3d 94, 98 (1st Cir. 2006) (alteration in original) (citation and internal quotation marks omitted).

The moving party, in this case C&S, bears the initial burden to demonstrate the lack of evidence to support the nonmoving party's case. *Celotex,* 477 U.S. at 325. To defeat summary judgment, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). Moreover, at the summary judgment stage, the court does not make credibility determinations or weigh the evidence. *Id.* If the court finds that some genuine factual issue remains, the resolution of which could affect the outcome of the case, then the court must deny summary judgment. *Id.* at 248.

In cases like this one, which involve questions of motive or intent, the movant's burden is particularly rigorous. *Medina v. Adecco*, 561 F. Supp. 2d 162, 165–66 (D.P.R. 2008). Unsettled issues regarding motive and intent will often preclude summary judgment. *See Lipsett v. Univ. of P.R.,* 864 F.2d 881, 895 (1st Cir. 1988). The court should deny summary judgment when the nonmoving party "can point to specific facts detailed in affidavits and depositions—that is, names, dates, incidents, and supporting testimony—giving rise to an inference of discriminatory animus." *Lipsett,* 864 F.2d at 895. Summary judgment may be appropriate, however, if the non-moving party's case rests merely upon "conclusory allegations, improbable inferences, and unsupported

speculation." *Forestier Fradera v. Mun. of Mayaguez,* 440 F.3d 17, 21 (1st Cir. 2006) (quoting *Benoit v. Technical Mfg. Corp.,* 331 F.3d 166, 173 (1st Cir. 2003)).

## II.   **Factual Background**

Taking all disputed facts in the light most sympathetic to Vega, as the party opposing summary judgment, the Court makes the following factual findings, which are either undisputed or conclusively supported by the evidentiary record.[2]

C&S is a company that distributes products from wholesalers to various retailers throughout the Commonwealth of Puerto Rico. Vega began working as a Merchandiser for C&S in November of 2008. He was later terminated from that position on April 12, 2018. C&S employs numerous merchandisers, whose duties include driving to certain retail stores along a specific route and providing products to retailers in accordance with their individual needs. Merchandisers are also responsible for stocking the shelves with the products they have delivered to the retailers.

Vega's daily working schedule was from 8:00AM until 5:00PM and his compensation included commissions and incentives for sales made within his assigned territory. Vega was required to fill out a "Daily Report" each time he visited a store as part of his working duties or obligations and in the ordinary course of business. At the end of his shift, Vega was required to call his supervisor to report that he had finished his daily duties. Every day Vega would call his supervisor in order to inform him that he had finished his work.

Throughout most of Vega's tenure with C&S, he served in the United States military. He enlisted with the Army Reserve on June 4, 2009 and remained an active member through the date of his termination. Vega's service required him to attend various military exercises, which often conflicted with his work schedule.[3] When Vega

---

[2] Pursuant to Local Rule 56, the Court will only deem as genuinely opposed those statements of material facts which the objecting party properly denied or qualified in strict compliance with Local Rule 56(c). The Court also credits only facts properly supported by accurate record citations. *See* Local Rule 56(e). The Court has disregarded all arguments, conclusory allegations, speculation, and improbable inferences disguised as facts. *See Forestier Fradera v. Municipality of Mayaguez,* 440 F.3d 17, 21 (1st Cir. 2006); *Medina-Muñoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir. 1990).

[3] *See e.g.* Docket No. 122-1 at 45-59 (timesheet documenting Vega's absences due to military exercises).

received an order from his superiors in the Army requesting his participation in a military exercise, he would present the order to his supervisors at C&S, and would thereafter attend the military exercises, returning to work after their completion.[4]

In January 2016, Juan Manuel Ortiz ("Ortiz") became Vega's direct supervisor. According to Vega's deposition testimony, his participation in military exercises invited hostility from Ortiz, who oversaw and coordinated the Merchandisers' schedules. Vega stated that Ortiz would routinely make comments related to his military service, telling him that his service was "a problem," and that he "could no longer tolerate" Vega's repeated absences due to military leave. According to another Merchandiser at C&S, Pedro Casillas-Rivera ("Rivera"), Ortiz would often make similar comments about Vega to him and to other employees when Vega was absent from work due to his military exercises.[5] Rivera stated that Ortiz complained of Vega's military absences "a whole bunch of times" and that Ortiz commented in meetings that Vega's absences "affected him," that "[Vega] must not continue working, and that [Ortiz] was going to fire [Vega]."[6] Another employee, Humberto Figueroa, stated that he, too, regularly heard Ortiz make comments to the same effect regarding Vega's military leaves.[7]

Vega also stated in his deposition that when he would tell Ortiz that his military orders were mandatory, Ortiz would respond that there were other employees at C&S who were in the military but who elected not to attend the exercises and encouraged Vega to follow suit. Vega avers that eventually, he began to fear that he would be

---

[4] Pursuant to the Court's Order at Docket No. 85, Vega has been precluded from relying on various, if not all the, military leave orders that he had *not* produced as part of discovery as of May 2019. Throughout the discovery process, Vega continuously failed to comply with his discovery obligations, and never produced to the defendant a certified copy of his complete military file, which the defendant requested multiple times to no avail. Even after the Court was forced to intervene in the matter, Vega's file was never produced. *See e.g.* Docket No. 56. Therefore, any military leave order not produced by Vega in compliance with the relevant Court orders will be stricken and *not* considered by the Court for purposes of summary judgment nor will they be considered in the future for any purpose intended by the plaintiff.
    The Court notes, however, that while the documentary record might reflect elsewhere that Vega might have presented military leave orders to his direct supervisor, Juan Manuel Ortiz, who would then grant such requests, any exhibit, such as Docket No. 117-11, which was filed in the Spanish language, cannot be considered by the Court. *See* Local Rule 5(g).
[5] *See* Docket No. 156-2 at 12-13.
[6] *See* Docket No. 156-2 at 17.
[7] *See* Docket No. 156-1 at 10.

terminated due to his participation in the military exercises, so he began to skip exercises.[8]

In addition to the above-stated comments, Vega indicated in his deposition that Ortiz would allegedly refuse to provide him assistance when he struggled to fulfill his duties at the various retailers along his route. Vega stated that Ortiz would meet his requests for help with derisive comments such as, "Aren't you in the Army?" and would thereafter fail to assign other Merchandisers to help him carry out his purportedly onerous assignments. However, Vega was accompanied, at times, by other Merchandisers who did assist him along his route.[9]

In addition to the above, Vega stated that he experienced other instances of negative treatment from Ortiz; namely, that Ortiz denied him a request to take vacation time to attend a school trip for his son's graduation and that Ortiz left him out of congratulatory emails, which Vega alleges were sent to all other employees at C&S (but him).[10] Furthermore, according to Vega, sometime in 2017, the conditions of his work changed substantially when Ortiz assigned him a "new" merchandising route. Each Merchandiser at C&S had a daily assigned route, which included several retailers within the same geographic radius. Vega's initial route included Caguas and was comprised solely of stores in that area but was allegedly changed to one in the Metropolitan area including "more difficult" stores primarily in San Juan. However, also according to Vega, though the route was officially laid out "on paper," the routes constantly changed. Vega testified in his deposition, that he could be working one day in Caguas, another in the 65th Infantry Street, and another in Isla Verde or Carolina, for instance.[11]

The alleged change in Vega's route came on the heels of a brief email correspondence between him and Ortiz, which then led to a heated verbal exchange.

---

[8] Though he was unable to provide an exact number, Vega estimated that he missed between five and ten exercises because of his fear that Ortiz would terminate him due to his continued absences from work. *See* Docket No. 99-2 at 105.
[9] *See* Docket No. 127-1.
[10] *See* Docket No. 99-2 at 66-67, 86.
[11] *See* Docket No. 99-2 at 66.

More specifically, after Vega had returned from a vacation, Ortiz sent Vega an email requesting his presence in his office. Vega stated that though he had received and opened the email, he mistakenly neglected to read it. After Vega failed to appear at Ortiz' office that morning, having not read the email, Ortiz sent Vega a second email stating that he was upset that Vega had chosen to disregard his request. Vega then replied to Ortiz' email, stating that he did not appreciate that Ortiz was questioning his honesty regarding his assertion that he had not read the email. In response, Ortiz sent a third email to Vega requesting his immediate appearance at the office. When Vega later showed up at the office, he and Ortiz engaged in a tense discussion regarding whether Vega had in fact read Ortiz' first email, which resulted in Ortiz stating that he was changing Vega's route. At that time, Ortiz did not explain to Vega his reason for changing his route.[12]

According to Vega, the new route in San Juan seriously inconvenienced him, as it included "more complicated" stores, which were larger and further away from his residence in Gurabo. Additionally, Vega claims that he was unable to take his mandatory one-hour lunch break each day, as the volume of work he was assigned by Ortiz required his constant labor. Although Vega avers that he complained to Ortiz about his inability to take his lunch breaks, he was never expressly prevented from doing so by anyone at C&S.[13] In fact, the Employee Manual at C&S states that if employees will not be taking their lunch break, they are required to request authorization to do so.[14] Vega never requested authorization from any of his superiors at C&S to omit his lunch break, though he maintains that he was unable to take his meal period every day since 2016 because of "the work itself."[15]

Vega claims that he was an exemplary employee but there is evidence in the record that he had received disciplinary actions in 2014 and 2016.[16]

---

[12] Docket No. 99-2 at 64.
[13] Docket No. 99-2 at 152.
[14] Docket No. 157-3 at 29.
[15] Docket 99-2 at 152.
[16] Docket No. 157-4.

_____

On April 2, 2018, at approximately 2:40PM, during Vega's working hours, Ortiz saw Vega in a Costco store in Caguas, which was outside of Vega's assigned route that day.[17] Despite Vega's repeated contention that he *never* set foot in the Costco during his shift but was merely in the Caguas area,[18] Vega's AT&T cellphone records confirmed that he was indeed at the Costco store that day during working hours. After seeing Vega, Ortiz made repeated attempts to call him to confront him about having abandoned his job post without first informing him, but Ortiz was unable to reach Vega because he was not answering his company-issued cellphone. On this day, Vega always had his personal cellphone and the cellphone issued to him by C&S. Abandoning the workplace without prior notice violated company policy.

According to the sworn statement of another Merchandiser at C&S, Rey Fuster Rodriguez ("Rodriguez"), Vega called Rodriguez to report that he had been in Costco and had seen Ortiz, though he was not sure whether Ortiz had also seen him.[19] After Vega failed to answer Ortiz' repeated phone calls, Ortiz then called Karvil Ortiz Nieves ("Nieves"), another supervisor who had been left in charge of Vega's route at the time, to see whether he had authorized Vega's early release from work that day.[20] Nieves replied that he had not released Vega, and that he had spoken with Vega a little while earlier. Vega had reported to Nieves that he was finishing his work at Supermercado Morales Las Cumbres. Immediately upon receiving this information from Nieves, Ortiz contacted the manager at Supermercado Morales Las Cumbres, who confirmed that Vega had been to his store much earlier in the day but was no longer there.

Another C&S employee, Luis F. Mass ("Mass"), then called Vega's phone, because Vega had not picked up any of Ortiz' calls from earlier that day. Vega answered Mass' call, and repeatedly denied that he was in the Caguas Costco store during work hours. Vega had also failed to answer Juan Luis Figueroa's ("Figueroa") phone calls. Vega later met with Figueroa, who confronted him about his whereabouts that day and Vega was

---

[17] Docket No. 99-4 at 9.
[18] Docket Nos. 129-2; 130-2.
[19] Docket No. 127-1 at 1.
[20] Docket No. 129-1 at 1-2.

unable to produce his client log sheet to demonstrate where he was earlier that day. Figueroa was the Sales Manager at C&S.

According to C&S, this incident warranted Vega's immediate dismissal because Vega violated company policies and procedures, including abandoning the workplace without notice during work hours and abandoning the area where they are assigned to work. In addition, C&S claims that Vega's dismissal was also warranted because when he was given an opportunity to explain the situation, instead of being straightforward, Vega lied to his supervisor and other company officials about his whereabouts on April 2, 2018. As noted above, though Vega firmly maintained that he was never at Costco the day of the incident that led to this termination, evidence confirmed that he was indeed there that day during his working hours.

In his defense, Vega claims that he was free to determine his trajectory along his route, as long as he was able to visit and complete his assignments at each of the stores. According to Rivera, it was allegedly generally accepted at C&S that Merchandisers were able to determine the method by which they would complete their assignments along their individual routes.[21] Notwithstanding, according to C&S Employee Manual, employees are not permitted to stray from their assigned route without obtaining prior authorization to do so.[22] And, though Vega maintains that he did not violate any company policy when he went to Caguas (but really to Costco) that day during his work hours, the employee manual states explicitly that employees are required to alert their supervisors when they conclude their work early. Vega never contacted his supervisor Ortiz, nor anyone in the company, to inform that he had completed his work before the end of his shift. Furthermore, when Ortiz and other employees called Vega to ask him about his whereabouts, Vega never picked up the phone.

Vega was terminated on April 12, 2018 because of the above incident by way of a letter handed to him by Figueroa. Vega claims that Figueroa told him verbally as he handed him the letter that he was being terminated because of his numerous military

---

[21] Docket No. 156-2 at 14.
[22] Docket No. 157-3 at 30-32.

absences, and also that it was "nothing personal." Figueroa maintains that he did *not* in fact make that statement upon handing Vega his letter of termination.

C&S's stated reason for terminating Vega was that he broke several company policies on April 2, 2018, when he allegedly abandoned his assigned work route during working hours without prior notice and that he lied about it when confronted later.

## III.   Discussion

Vega alleges that C&S unlawfully discriminated and retaliated against him in violation of USERRA. More specifically, he claims that C&S took several adverse employment actions against him and ultimately terminated him as a result of his protected military status. Vega also claims that he was subjected to a hostile work environment in violation of USERRA. In addition, he alleges that he was unlawfully terminated in violation of Puerto Rico Law 80 and that he was the victim of retaliation in violation of Puerto Rico Law 115. Finally, Vega claims that C&S withheld overtime wages from him in violation of the FLSA and Puerto Rico Law 379. C&S now moves for summary judgment on Vega's claims. The Court addresses each of Vega's claims in turn.

1.    USERRA: Discrimination and retaliation based on military service

The purpose of USERRA is to encourage non-career military service, minimize disruption based on this service, and prevent discrimination against service members. 38 U.S.C. § 4301. *Vega-Colon v. Wyeth Pharm.*, 625 F.3d 22, 25 (1st Cir. 2010). To this end, USERRA provides that:

> A person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation.
>
> An employer may not discriminate in employment against or take any adverse employment action against any person because such person (1) has taken an action to enforce a protection afforded any person under this chapter, (2) has testified or otherwise made a statement in or in connection with any proceeding under this chapter, (3) has assisted or otherwise participated in an

_____

> investigation under this chapter, or (4) has exercised a right
> provided for in this chapter. The prohibition in this subsection
> shall apply with respect to a person regardless of whether that
> person has performed service in the uniformed services.

38 U.S.C. § 4311(a)-(b).

The initial inquiry for this Court is what protected status and/or conduct served as the basis for the C&S' allegedly adverse employment actions. In the present case, it is uncontested that Vega, at all relevant times, was, and still is a member of the U.S. Army Reserve. Vega contends that the Defendant's discriminatory and retaliatory actions stemmed from his membership in the military and his decision to request multiple military leaves to attend military drills and exercises and his resulting service. Thus, Vega's membership in a uniformed service and performance of service are the respective conduct and status at issue. *See* 38 U.S.C. § 4311(a). *See Vega-Colon*, 625 F.3d at 26.

The next question is *when* did the protected conduct and status occur. *Id*. Vega claims that the adverse employment actions allegedly taken against him by C&S were the result of his military status and his requests for military leave that occurred after 2016, when Ortiz became Vega's supervisor. Determining *when* the protected conduct occurred is a particularly difficult question here because the instances of Vega's requests for military leave, and his resulting service, could best be shown by his official military leave orders. The problem is that Vega failed to produce his military leave orders during discovery and, as a result of his continued failure to disclose such orders and his complete military file, the Court was forced to preclude the use of any military order that was *not* produced during discovery. (*See* Docket No. 85).[23]

As a result, the Defendant argues that *without* the military leave orders, which specify the dates in which Vega went on military leave, it is impossible for him to survive summary judgment on his discrimination and retaliation claims because he cannot

---

[23] As noted above, the Court sanctioned Vega for his continued discovery violations by barring the use of any military leave order which had not been produced to the Defendant as of May 3, 2019. (*See* Docket No. 85). So, for example, Vega cannot rely on any such military order to show either the date of the military leave order or temporal proximity between any of the alleged adverse employment actions and Vega's military leaves.

_____

prove the requisite temporal proximity. In response, Vega claims that various military leave orders were indeed disclosed to the Defendant during discovery and that some were included in his personnel file, which was produced by the Defendant itself. (*See* Docket No. 133-7). For now, the Court need not resolve this controversy because there is other pertinent evidence on the record and, therefore, it can turn to the merits of Vega's claims, particularly whether Vega's membership in uniformed service and performance of service (while on military leave) formed the basis for either of the Defendant's allegedly improper actions.

To prevail on a claim of discrimination and retaliation under USERRA, the burden is on Vega to make an initial showing that his military status "was at least a motivating or substantial factor" in the adverse employment action taken against him by his employer. *Vega-Colon*, 625 F.3d at 27 (citing *Velázquez–García v. Horizon Lines of Puerto Rico, Inc.,* 473 F.3d 11, 17 (1st Cir. 2007) (internal citation omitted); *see also* 38 U.S.C. § 4311(c)(1)–(c)(2). Thus, Vega must *first* show that an adverse employment action was taken against him, and once he establishes that, he must show that discriminatory or retaliatory animus played a substantial or motivating role in such action. If Vega can make this initial showing, the burden then shifts to the defendant to "prove, by a preponderance of the evidence, that the action would have been taken despite the protected status." *Velázquez–García,* 473 F.3d at 17.[24] In analyzing a claim under USERRA, the First Circuit has instructed trial courts to utilize the same standards applied when analyzing claims under Title VII. *Id.* at 18 n.7 (1st Cir. 2007). Knowing the parties' respective burden of proof, the Court now turns to each of Vega's allegedly adverse employment actions.

_____

[24] Among the varieties of evidence that may be offered by a plaintiff to meet his initial burden of showing discriminatory motivation are "proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the proffered reason and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses." *Sheehan v. Dep't of Navy,* 240 F.3d 1009, 1014 (Fed.Cir.2001).

_____

## a.     Vega's termination of employment

Vega claims that he was dismissed in violation of USERRA. Here, it is undisputed that Vega was terminated by the Defendant on April 12, 2018. Firing an employee certainly constitutes an adverse employment action under applicable law. Having established that, Vega now bears the burden of making an initial showing that his military status was "at least a motivating or substantial factor" in his termination. *See Velazquez-Garcia,* 473 F.3d at 11.

In the present case, Vega claims that he was terminated less than 40 days after returning from a military leave which took place from February 22 to March 19, 2018. (*See* Docket No. 133-7 at 22).[25] Moreover, Vega claims that he was terminated because of his status as a servicemember. More specifically, he alleges that his supervisor Ortiz wanted to terminate him because he was in the military, that Ortiz continuously made discriminatory comments regarding his military service, and that Ortiz allegedly said that his continued military absences were becoming "a problem." On its part, the Defendant claims that Vega was terminated for a legitimate and non-discriminatory reason, unrelated to his status as a servicemember.[26] Additionally, the Defendant claims that, as ordered by the Court, Vega is precluded from using his military leave orders and, as a result, it is impossible for him to establish the dates on which he attended military drills and exercises, therefore, he cannot show close temporal proximity between his protected conduct under USERRA and his termination. In response, Vega claims that he did produce various military leave orders to the Defendant during discovery. (*See* Docket No. 133-7). Irrespective of the military orders' issue, Vega basically claims that he raised triable issues of fact as to whether his termination was motivated by discriminatory or retaliatory intent and, as such, the Defendant is not entitled to summary judgment on this claim. The Court agrees.

_____

[25] Vega points to this military leave order to further his cause. From the parties' briefs, however, it was not entirely clear whether this military leave order had been produced by Vega in compliance with the Court's directives and in a timely manner during discovery. Though the Court mentions this military leave order in this Opinion, the Court wants to make pellucid that it is not finding that Vega can in fact use that document to further his claim. If it is determined in due course that Vega had *not* produced this military leave order, or any other order, they shall be stricken.

[26] The Court will address the Defendant's proffered legitimate and lawful reason in due course.

_____

Taking all reasonable inferences in Vega's favor, albeit a close call, the Court finds that Vega has met his initial burden of showing that his membership in the military and participation in service was at least a motivating factor in his termination. Vega satisfies his initial burden primarily through the statements in his deposition testimony regarding the abundance of discriminatory comments purportedly made by his supervisors, mainly Ortiz, related to his military status and related absences. For example, Vega testified that Ortiz frequently commented that his military service and multiple leaves to attend military drills and exercises were "problematic" and that his membership and service would eventually result in his termination. Vega points not only to the remarks by Ortiz, but also to complaints by Ortiz about the difficulty of adjusting Vega's work schedule as a result of his military leaves. Vega also testified about comments made by Ortiz tending to show his alleged distaste for Vega's participation in military service. To that effect, Vega stated that every time he requested military leave, Ortiz would always complain about his absences and make discriminatory remarks about his participation in military drills and exercises. Moreover, Vega's assertions regarding the frequency of the discriminatory comments made by Ortiz, if true, could indeed establish a pattern of discrimination that persisted over a two-year period, from 2016 (when Ortiz assumed his role as Vega's direct supervisor) until Vega's termination in 2018. Furthermore, Vega testified that on the date of his dismissal, upon being handed his termination letter, Jose Luis Figueroa told him that he was being dismissed because Ortiz could no longer tolerate his military-related absences. Figueroa, on his part, denies making such assertion, thus creating a credibility issue ripe for a jury.

The bulk of Vega's evidence establishing discriminatory animus rests on his own deposition testimony. The Defendant complains of Vega's overt reliance in his own deposition to survive summary judgment. While this could be viewed as self-serving, it is not fatal to Vega's cause. "Provided that the nonmovant's deposition testimony sets forth specific facts, within his personal knowledge, that, if proven, would affect the outcome of the trial, the testimony must be accepted as true for purposes of summary judgment". *See Velazquez*, 473 F.3d 11 at 18. That is the case here. Though Vega heavily

relies on his own deposition and does fail in some instances to present specific times and dates, he does allege with precision specific facts based on his personal knowledge, which, if proven, could affect the outcome of this case. Such statements must therefore be taken as true for purposes of the summary judgment analysis. The Court notes moreover that, in addition to Vega's own testimony, the record also contains sworn, signed affidavits and deposition testimony from *other* employees alleging that superiors, including Ortiz, did make negative statements about Vega's military status, which, if proven to be true, would verify the relevant portions of Vega's own testimony. For example, the deposition testimony of Mr. Casillas-Rivera and Mr. Figueroa reveals that Ortiz routinely made alleged discriminatory comments related to Vega's military status out of Vega's presence, within earshot of other employees in the workplace. Thus, there is record evidence (in addition to Vega's own testimony) confirming that discriminatory comments about Vega's status as a servicemember were made by his supervisor.

Even so, the Defendant dismisses the discriminatory comments allegedly made by Ortiz as "stray remarks," arguing that they, do not demonstrate discriminatory motivation. While it is true that stray workplace remarks, *standing alone*, do not ordinarily support a showing of discriminatory animus (*See González v. El Día, Inc.* 304 F.3d 63, 69 (1st Cir. 2002)), here, there is more than just stray workplace remarks. *See Velazquez-Garcia,* 473 F.3d at 18; *McMillan v. Mass. Soc'y for Prevention of Cruelty to Animals,* 140 F.3d 288, 300–01 (1st Cir. 1998) ("stray remarks may properly constitute evidence of discriminatory intent for the jury to consider in combination with other evidence"); *cf. Santiago–Ramos,* 217 F.3d at 55 (decisionmaker's comments and timing of firing are material facts for a jury to consider). Additionally, the discriminatory comments in this case were allegedly made by Vega's superiors, and most prevalently by his direct supervisor, Ortiz, who could be considered a decisionmaker. *See Santiago–Ramos,* 217 F.3d at 55 (citing *Sweeney v. Bd. of Trustees of Keene State Coll.,* 604 F.2d 106, 113 (1st Cir. 1979)). "[S]uch evidence . . . does tend to add 'color' to the employer's decision[-]making processes and to the influences behind the actions taken with respect to the individual plaintiff." *Cummings v. Standard Register Co.,* 265 F.3d 56, 63 (1st Cir. 2001) (internal quotation marks omitted) (quoting *Conway v.*

_____

*Electro Switch Corp.*, 825 F.2d 593, 597 (1st Cir. 1987)). Finally, and that which is significant here, Ortiz rejects Vega's contentions and denies making such comments, thus creating a factual dispute requiring a credibility determination by the fact-finder, which is not the role of the Court in this instance.

Based on the foregoing, on the whole, Vega's aggregate package of proof, if proven to be true, could carry some weight with a jury and could ultimately show discriminatory animus sufficient to establish a link (however substantial or attenuated a jury may perceive it to be) between his termination and his membership in the military and his participation in military service. Because Vega has made his initial showing, the burden now shifts to the Defendant to "prove, *by a preponderance of the evidence*, that Vega's termination would have been taken despite the protected status." *Velázquez–García,* 473 F.3d at 17. The Defendant must therefore adequately demonstrate that it had a non-pretextual reason for firing Vega. "The issue under USERRA is not whether an employer is entitled to dismiss [or otherwise discriminate against] an employee for a particular reason, but whether it would have done so if the employee were not in the military." *Vega-Colon v. Wyeth Pharmaceuticals*, 625 F.3d 22 (1st Cir. 2010) (citing *Velazquez,* 473 F.3d at 20).[27]

Regarding C&S' motive for terminating Vega, C&S argues that it would have terminated Vega for legitimate business reasons regardless of his membership in the military and his participation in military service. C&S claims that Vega was dismissed for violating several company policies and rules outlined in the Employee Manual, and for lying to company officials. More specifically, C&S contends that on April 2, 2018,

_____

[27] As the First Circuit has noted:

> [t]his two-pronged burden-shifting analysis is markedly different from the three-pronged burden-shifting analysis in Title VII actions. Under the *McDonnell Douglas* framework, the burden of persuasion in Title VII actions always remains with the employee. . . . In contrast, under USERRA, the employee does not have the burden of demonstrating that the employer's stated reason is a pretext. Instead, the employer must show, by a preponderance of the evidence, that the stated reason was *not* a pretext.

*Velazquez–Garcia v. Horizon Lines of P.R., Inc.,* 473 F.3d 11, 17 (1st Cir. 2007) (emphasis in the original).

Vega abandoned his workplace and his established route during work hours to visit the Caguas Costco (which was not part of his route nor part of his work assignments). C&S also claims that Vega failed to notify his supervisor that he had concluded his work *prior* to the conclusion of his shift, and that he failed to keep an open line of communication with his supervisors by failing to answer his company-issued cellphone in the repeated attempts made by Ortiz, and other superiors, to reach him. C&S further avers that each conduct violated company policy and constituted an independent infraction under the provisions of C&S's Employee Manual, each of which justified his immediate termination. Moreover, C&S argues that after being "caught red-handed," Vega lied to try to cover his tracks and that lying constitutes a fireable offense on its own accord. On this record, it is uncontested that Vega in fact lied about his whereabouts on April 2, 2018. Vega repeatedly claimed that he *never* set foot in the Caguas Costco store but the evidence on record proved that he *was* in fact at that store, on that day, during working hours.[28] As such, C&S claims that in addition to his multiple violations of company rules, Vega's dishonesty also merited his immediate dismissal.

In this case, the combination of Vega's offenses, which appear to have violated several company policies, together with his subsequent dishonesty, could be found by a fact-finder to be legitimate, non-discriminatory reasons on which to terminate Vega. But while Vega's actions may well prove to have been fireable offenses under C&S's policies, there is evidence in the record to suggest that Vega's termination could have also been motivated, at least to some degree, by his membership in the military and his resulting service. The Court expounds further.

First, as noted above, Vega testified that he was specifically told by Figueroa, an upper level employee, that he was being discharged because Ortiz could not tolerate his military leaves. He further claims that once he was informed of his termination, there was no mention of the events that occurred on April 2, 2018 as a cause for his dismissal. Clearly, Vega has pointed to evidence establishing a connection between his termination and his military status. Though Figueroa maintains that the above statement was *not*

---

[28] *See* Docket Nos. 99-4 at 9; 129-2; 130-2.

in fact made upon handing Vega his letter of termination, this contested issue is best resolved by a jury, as it is not the function of the Court to make determinations as to the credibility of the testimony contained in the parties' depositions and sworn statements. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge").

Second, Vega claims that he never violated any of the Defendant's policies on April 2, 2018, because according to him and another merchandiser, Pedro Casillas-Rivera, it was generally understood by the Merchandisers at C&S that they could independently determine the direction of their travel to and from the stores along their routes. This assertion, if found to be true, could lessen the severity of the alleged infraction and plants a seed of doubt as to whether Vega's actions on April 2, 2018 warranted immediate termination. Vega also points out that on the day at issue, his daily report log, which is signed by the managers of C&S' clients, corroborates that he was in his route that day and that he fully complied with servicing the required stores and clients assigned to him that day. Given the above, a reasonable fact finder could question why Vega being seen in a Costco store on April 2, 2018 (while otherwise sufficiently performing his duties at work) would be so egregious as to merit the level of investigation and scrutiny that arose, which resulted (at least in part) in his termination.

Finally, Vega maintains that he did not lie about his whereabouts on April 2, 2018, clinging to mere technicalities as to the wording of the questions posed to him that day by his supervisors and his "technical" answers. In his opposition to summary judgment, he claimed that he was in Caguas but *not* in Costco. Despite repeatedly denying it, Vega's AT&T cellphone records confirmed that he was indeed at the Caguas Costco store on the date and hours at issue. *See* Docket Nos. 99-4 at 9; 129-2; 130-2. Though Vega avows that he never lied, it is clear that he did. The evidence reveals that he did in fact lie about "not" being in Costco during work hours on April 2, 2018, because he in fact was. It is certainly not lost on the Court that an employee's dishonesty is a grave concern from an employer's standpoint and indeed a sanctionable offense.

Nevertheless, it must be noted that the alleged fireable offenses here, including lying, appear to be among very few documented offenses (or disciplinary actions) in Vega's approximately 10 years of employment with C&S. The Defendant does point to Vega's disciplinary record, but there appear to be only two disciplinary infractions from 2014 and 2016, respectively, during Vega's long tenure in C&S. There is also no documentary evidence that Vega was a problematic, untrustworthy, or ineffective employee over his decade of employment at C&S.

In sum, Vega has created triable issues of material fact sufficient to withstand summary judgment on the question of whether his status as a servicemember and his participation in military service (related to his leaves to attend military exercises) were at least a motivating factor in the decision to terminate him. After weighing the evidence presented and viewing the 'aggregate package of proof offered by the plaintiff' in the light most favorable to Vega as the non-moving party, the Court finds that a jury could conclude that Vega's termination was motivated to some degree by discrimination or retaliation based on Vega's military status. At this stage, therefore, C&S has not proven, by a *preponderance of the evidence* (as is its burden,) that it would have dismissed Vega regardless of his protected status as a servicemember. *See Velázquez–García,* 473 F.3d at 17; *Dominguez–Cruz v. Suttle Caribe, Inc.,* 202 F.3d 424, 431 (1st Cir. 2000) (quoting *Mesnick v. Gen. Elec. Co.,* 950 F.2d 816, 825 (1st Cir. 1991)).

Accordingly, summary judgment is not appropriate on Vega's discrimination and retaliation claims under USERRA with respect to his termination. C&S' request for summary judgment on this claim is thus **DENIED**.

### b.    Route change

In addition to his termination, Vega claims that his route reassignment—from Caguas to the San Juan area—violated USERRA. More specifically, he claims that his route was changed on May 2, 2016, after a discussion he had with Ortiz. Ortiz sent an email ordering Vega to report to the office and Vega did not comply claiming that he did not read the email. As a result, an altercation between the two ensued. Vega claims that Ortiz changed his route as a result of this argument and that the change occurred less than 30 days after he gave Ortiz a military leave order dated April 7, 2016, for which he

_____

requested military leave. Vega claims that the route change constituted an adverse employment action because the "new" route was further from his home in Gurabo and it included "new," "bigger" and "more complicated" stores. Defendant's explanation for the route change is that it had nothing to do with his protected status as a servicemember and that, like Vega stated, an argument ensued between Ortiz and Vega immediately prior to Ortiz instituting the change. The argument is duly reflected by the record and there is no indication that it had *anything* to do with Vega's protected status.

USERRA provides that an employer "may not discriminate in employment against or take any adverse employment action against any person because such person . . . has taken an action to enforce a protection afforded" under USERRA. 38 U.S.C. § 4311(b). The question now is whether Vega's alleged route change constituted an adverse employment action, which "typically involves discrete changes in the terms of employment, such as 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" *Cham v. Station Operators, Inc.*, 685 F.3d 87, 94 (1st Cir. 2012) citing *Morales Vallellanes v. Potter*, 605 F.3d 27, 35 (1st Cir. 2010). For that element to be present:

> [t]ypically, the employer must either (1) take something of consequence from the employee, say, by discharging or demoting [him], reducing [his] salary, or divesting [him] of significant responsibilities or (2) withhold from the employee an accouterment of the employment relationship. . . .

*Blackie v. State of Me.*, 75 F.3d 716, 725 (1st Cir. 1996). "A materially adverse change in terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. Whether an employment action is materially 'adverse'—and therefore actionable under Title VII [and USERRA]—[is] gauged by an objective standard." *Id.* In addition to the above, the First Circuit has cautioned that:

> [w]ork places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action.

_____

*Id. See Martin v. Stericycle, Inc.*, 389 F. Supp. 2d 131, 134 (D. Mass. 2005).

In the present case, the record evidence does not support a finding that Vega's alleged route change constituted an adverse employment action. Vega did not point to evidence showing *how* the route change negatively affected his terms and conditions of employment in a tangible manner. Vega merely complains that the San Juan route was basically "harder" for him, that it included "larger" stores, and it was further from his home in Gurabo. That however is not enough. Vega neither alleges nor shows that the route change caused a discrete change in the terms of his employment nor does he point to any evidence showing that it actually altered his position or duties or that it significantly affected his responsibilities. Though Vega claims that the "new" route was more difficult for him, he did not offer any evidence tending to show that there was an increase in his hours worked or in his duties in comparison to his "prior" routes. There is also nothing in the record to suggest that Vega's salary or benefits were adversely affected by this action.

Even construing the record in the light most favorable to Vega, the change in route appears more like a "mere inconvenience" that an action that actually disrupted the terms and conditions of his employment in a materially "adverse" way. *See Morales-Vallellanas*, 605 F.3d at 35.[29] In this case, there is simply no evidence that C&S' action involved a discrete or materially "adverse" change in Vega's employment. The mere fact that Vega was displeased by C&S' decision does not elevate that action to the level of a materially adverse employment action that might entitle him to relief. *See Blackie,* 75 F.3d at 725. On this basis, Vega failed to make an initial showing that the route change constituted a cognizable adverse employment action and, therefore, this claim does not pass muster.

_____

[29] Though a route reassignment might constitute an adverse employment action under *different* circumstances, that is not the case here. *See e.g. Carlson v. N.H. Dep't of Safety*, 609 F.2d 1024, 1027 (1st Cir. 1979) (finding that a shift reassignment requiring weekend work, night work, and longer hours constituted adverse employment action); *Ortiz Molina v. Rimco, Inc.,* Civ. No. 05-1181 (JAF), 2006 WL 2639297, at *4 (D.P.R. Sept. 13, 2006) (finding that plaintiff's managerial assignment to new store which resulted in more erratic schedule and longer work hours constituted adverse employment action).

VICTOR M. VEGA COLON V. COLOMER & SUAREZ SAN JUAN, INC.,                                                      - 21-
Civ. No. 18-1360
_____

In sum, because the Court finds that Vega has not satisfied his initial burden of demonstrating that the alleged route change constituted an adverse employment action, the Defendant is entitled to summary judgment on this issue. Vega's discrimination and retaliation claim under USERRA with respect to his route change is **DISMISSED with prejudice.**[30]

Though Vega cannot prevail on this claim, the Court feels compelled to make a final comment. Vega's claim is also unavailing because of Vega's own statements, which on their face, disprove his contention that an alleged route change constituted an adverse employment action. Significantly, Vega repeatedly and vehemently *denies* having an assigned route. (*See* Docket No. 133-1 at 4, 11). He maintains that up until the day of his termination he did *not* have an assigned route and that every day he serviced *different* clients in *different* municipalities. *Id*. Vega further claims that, on a daily basis, he had to follow his supervisor's instructions with respect to the route to which he was assigned and that he "could be one day in Isla Verde, another day in Santurce, another day in Caguas, and another day in 65th Infanteria, another day in Carolina *since there was no route*." *Id*. Vega also contends that each morning Ortiz assigned *different* stores to him in *different* municipalities. *Id*. If Vega freely (and fervently) argues that he did *not* have an assigned route, and that his route changed

_____

[30] Because Vega did not demonstrate that the change in route constituted an adverse employment action, the Court need not reach the second part of the initial inquiry—whether the action was motivated, at least partly, by Vega's protected status. But, even if Vega had met his burden, the claim would not prevail because Vega did not point to any evidence showing that discriminatory animus motivated the decision to change his route. In this case, for instance, Vega did not show *when* the alleged route change occurred, which is fatal to his cause because he cannot show proximity in time between his military activity and the route change. Though Vega broadly claimed that the route change occurred on May 2, 2016, allegedly less than 30 days after he gave Ortiz a military leave order requesting leave for April 2016, he failed to point to any evidence to support that assertion. Significantly, Vega points to pages 52 thru 54 of his deposition testimony to show that the action occurred on May 2, 2016, however, the Court reviewed the record, and, in that testimony, he clearly stated that he did *not* recall the date of the route change. (*See* Docket No. 133-1 at 10). Vega also points to various emails to "prove" the date of the employer's action but he did not offer a record citation for *any* of them. *Id*. Vega's claim therefore cannot succeed because without evidence to show that the change in route actually occurred in May 2016, it is impossible for him to demonstrate a causal link between the alleged route change and his protected status. Finally, the Court notes that Vega admitted that he does *not* know whether at the time his route was "changed" other employee's routes were changed as well. This further casts doubt on Vega's claim because there is no evidence tending to show that Vega was treated differently than other employees based on his protected status.

constantly—on a daily basis in fact—it defies reason that an alleged change in route could have adversely affected his terms and conditions of employment. Indeed, Vega cannot claim on one hand that he did *not* have an assigned route while on the other hand complain that a "change in route" constitutes an adverse employment action. That obvious incongruity is fatal.

### c.    Additional adverse employment actions

Vega also claims that two additional adverse employment actions were allegedly taken against him because of his military status: (1) not being assisted with his "heavy workload," more specifically, not receiving assistance from another Merchandiser to help him in his route, and (2) being denied a request for vacation time related to his son's graduation. These allegedly adverse employment actions fare no better. To begin with, Vega neither argued nor offered any evidence showing *how* either of these actions negatively affected his terms and conditions of employment in a tangible manner. Even construing the record in the light most favorable to Vega, the evidence on this record does not support a finding that either of the above-mentioned actions by the employer constituted an adverse employment action that could entitle Vega to relief under USERRA.

As to the first action, Vega claims that Ortiz did not assign another Merchandiser to assist him with his route. Though Vega complains that Ortiz *could have* assisted him, on this record, Vega did not show that this allegedly adverse employment action materially affected him in an "adverse" and concrete manner. The fact that C&S did not assign other Merchandisers to assist Vega in fulfilling his *own* duties cannot be found to have adversely affected his employment because there is no evidence that such omission involved a discrete or materially adverse change in the terms and conditions of his employment. Vega's naked and conclusory assertion that he saw some emails related to the Merchandiser's schedule and therefore Ortiz *could have* assisted him by assigning other employees to help him, but chose not to, is insufficient without any evidentiary support. Vega neither alleges nor points to any evidence to show that *not* receiving the assistance he wanted altered his position or that it affected his performance. Quite the opposite, in fact, Vega repeatedly claims that he always excelled

_____

in his job performance and never had any performance issues. Therefore, the Court must understand that Vega could in fact perform the duties of his position *without* "assistance." The record is also bereft of any evidence suggesting that Vega's salary or benefits were adversely affected by this action.

Furthermore, Vega did not point to any evidence suggesting that C&S had an obligation to "assist" him (or any other employee for that matter,) by assigning other Merchandisers to travel along his route. Nor is there evidence that C&S had a practice of doing this with other Merchandisers but denied Vega of that opportunity. It appears that each Merchandiser, like Vega, was solely responsible for completing the duties of their position. Notwithstanding, there is evidence in the record that, at times, Vega was assisted in his route by other Merchandisers.[31] Vega also failed to proffer evidence to show that C&S was in fact *able* to provide Vega with the assistance he desired at the times during which he allegedly requested it. The above is all fatal to Vega's cause because for an employment action to be materially "adverse" it must be "more disruptive than a mere inconvenience." *See Morales-Vallellanas*, 605 F.3d at 35. The mere fact that Vega was displeased by C&S' decision does not elevate that omission to the level of a materially adverse employment action. *See Blackie,* 75 F.3d at 725.

As for Vega's second proposition, Vega claims that C&S' denial of his request for vacation time to attend a trip to the Dominican Republic to celebrate his son's high school graduation constitutes an adverse employment action. Vega's argument is unavailing for several reasons. To begin with, in his deposition testimony Vega admitted that, in fact, Ortiz *granted* his original request for such vacation leave (for different dates).[32] It is uncontested that it was only *after* a later rescheduling of the trip that Ortiz informed Vega that he was unable to grant him leave for those new dates. Like the other action complained of by Vega, the denial of his request for (rescheduled) vacation time appears more like a "mere inconvenience" than an action that actually disrupted the terms and conditions of his employment in a materially "adverse" and tangible way. *See Morales-Vallellanas*, 605 F.3d at 35. The mere fact that Vega was

_____

[31] *See e.g.* Docket No. 127-1.
[32] *See* Docket No. 99-2 at 106.

_____

displeased by C&S' action denying his request for vacation leave does not elevate that action to a materially adverse employment action. *See Blackie,* 75 F.3d at 725. Moreover, Vega did not point to any case law suggesting that the denial of vacation time, without more, constitutes an adverse employment action.

It is also questionable that Vega produced no evidence of either of the requests for vacation time and even failed to identify during his deposition the dates of the trip. He was also unable to furnish receipts or confirmation emails of his plane tickets and could not even remember the month or year of the trip initially.[33] There is also no evidence that Vega's "amended" vacation request was submitted in a legitimate manner or that he provided Ortiz with notice sufficient to allow him to accommodate Vega's absence in the work schedule. Based on the foregoing, Vega has failed to meet his burden of establishing that this action by the employer constituted an adverse employment action.[34]

In sum, because Vega cannot prove that any privilege or right to which he was entitled was "taken" or "withheld" from him with respect to either of these two actions, neither can be said to constitute a cognizable adverse employment action. For an employment action to be materially "adverse" it must be "more disruptive than a mere inconvenience" and, on this record, no reasonable factfinder could find that either of these allegedly adverse employment actions entailed a discrete or materially "adverse" change in the terms and conditions of Vega's employment. *See Morales Vallellanes*, 605 F.3d at 35. As such, neither of these claims can survive because Vega did not show that he was subjected to an "adverse employment action." *Sheehan,* 240 F.3d at 1013 (the

---

[33] *See* Docket No. 99-2 at 67.

[34] Though the Court need not reach the question of discriminatory animus on this claim because Vega did not meet his initial burden, the Defendant's explanation for the action was that it was unable to accommodate the new dates requested by Vega for valid business reasons. The Defendant thus set forth a legitimate and non-discriminatory reason for its decision, which was related to the operation of the business and not Vega's military status. Vega did not challenge, or at least cast doubt on, the Defendant's proffered reason for its decision. That omission is quite telling. Finally, Vega neither alleged nor suggested that Ortiz was in fact able to grant the request but chose not to for some nefarious reason. This is all fatal to Vega's claim.

plaintiff must first show that he was subjected to an "adverse employment action" to make his initial showing of stating a viable claim under USERRA).[35]

Accordingly, Vega's discrimination and retaliation claims under USERRA with respect to these actions are **DISMISSED with prejudice.** To sum up, Vega's dismissal is the only surviving claim of discrimination and retaliation under USERRA.

2.   <u>Retaliation in violation of Puerto Rico Law 115</u>

In his complaint, Vega also asserts a claim under Puerto Rico's anti-retaliation statute ("Law 115"). *See* 29 LPRA §§ 194–194b. He claims that C&S took retaliatory actions against him in violation of said statute. The Defendant basically argues that Vega's Law 115 claim should be dismissed because he failed to make out his *prima facie* showing as he did not engage in protected activity as it is defined by the statute.

In general, this statute makes it unlawful for the employer to discharge, threaten, or discriminate against an employee regarding terms, conditions, compensation, location, benefits or privileges of employment should the employee offer or attempt to offer any testimony, expression or information before a legislative, administrative or judicial forum in Puerto Rico. *See* P.R. Laws Ann. tit. 29 § 194(a) (emphasis added). The statute imposes an obligation on the employee to establish, through direct or circumstantial evidence, a *prima facie* case proving that: he or she (a) participated in an activity protected by §§194 et seq., and that (b) he or she was subsequently dismissed

---

[35] Plaintiff also complains of two additional—and lesser—"adverse" employment actions. Vega claims that he missed some of his military exercises allegedly because of Ortiz' comments and that he was left out of congratulatory group emails regarding sales. Vega however does not provide much argumentation, detail, or evidence to show that either of these two actions affected the terms and conditions of his employment in a tangible manner. Vega limits his claims with respect to these two actions by merely listing them in the most skeletal and conclusory manner. The record however is utterly bereft of evidence that would demonstrate that either alleged action by the Defendant sufficiently qualifies as a cognizable adverse employment action. As such, they indeed suffer the same fate as the ones discussed above.

For an employment action to be materially "adverse" it must be "more disruptive than a mere inconvenience" and, on this record, no reasonable factfinder could find that either of these allegedly adverse employment actions entailed a discrete or materially "adverse" change in the terms and conditions of Vega's employment. *See Morales Vallellanes*, 605 F.3d at 35. As such, they do not rise to the level of actionable adverse employment actions under USERRA and must be **DISMISSED with prejudice.**

_____

or suffered an adverse employment action. *Id. Feliciano Martes v. Sheraton Old San Juan*, 182 D.P.R. 368, 2011 PR Sup. LEXIS 89 (P.R. 2011); *Lupu v. Wyndham El Conquistador Resort & Golden Door Spa*, 524 F.3d 312, 313 (1st Cir. 2008). *See generally Hoyos v. Telecorp Commcns, Inc.*, 405 F.Supp.2d 199, 207 (D.P.R.2005); *Rivera Rodriguez v. Sears Roebuck De P.R., Inc.*, 367 F.Supp.2d 216, 230 (D.P.R.2005).

The Court already found that Vega sufficiently asserted *one* cognizable adverse employment action—his employment termination. As such, the analysis is limited to that claim. Vega must first show that he participated in an activity protected by §194(a). In the present case, there is no evidence that Vega "offer[ed] or attempt[ed] to offer, verbally or in writing, any testimony, expression or information before a legislative, administrative, or judicial forum in Puerto Rico." P.R. Laws Ann. tit. 29, § 194a(a).[36] To state his retaliation claim under Law 115, Vega argues that he requested several military leaves and complained about Ortiz' alleged discriminatory comments and was subsequently dismissed. Only the former claim survives summary judgment.

With respect to Vega's termination—the only surviving adverse employment action—Vega's multiple requests for military leave certainly might constitute protected conduct under USERRA, but Vega has neither alleged nor presented any case law suggesting that it constitutes activity protected under Law 115. Vega's burden under Law 115 is more stringent than under USERRA, as the former requires an employee to establish not only discrimination, but that the employer's non-discriminatory reason is a pretext. *See* 29 LPRA § 194a(c); *Vega-Colon*, 625 F.3d at 34. Assuming, without deciding, that Vega's requests for military leave constitute protected conduct under Law 115, for the same reasons that Vega's discrimination and retaliation claims under USERRA survive summary judgment, Vega's Law 115 claim survives as well. As noted in that discussion, Vega has sufficiently raised genuine issues of material facts to

---

[36] In general terms, Law 115 covers employees who have testified or attempted to testify before an administrative, legislative or judicial body. *Villanueva–Batista v. Doral Financia*l, 357 Fed.Appx. 304, 306 (1st Cir.2009); P*abón–Ramírez v. MMM,* 2013 WL 1797041, at *9 (D.P.R. April 29, 2013); *Feliciano Martes*, 182 D.P.R. at 393.

question whether the Defendant's proffered legitimate and non-discriminatory reason for terminating him is pretextual.[37]

In contrast, however, Vega's remaining claim that he was terminated for complaining about Ortiz' alleged discriminatory comments is unavailing. More specifically, Vega claims that he complained to Juan Luis Figueroa about the discriminatory comments made by Ortiz and that such action somehow played a role in his termination. Even assuming that such complaints could constitute protected conduct under Law 115, there is not a shred of evidence in this case suggesting that Vega's alleged complaints played a part in the decision to terminate his employment. Vega has not established through direct or circumstantial evidence, as was his burden, that such verbal complaints were at least a motivating factor in C&S' decision to terminate him. This claim thus fails and is **DISMISSED with prejudice**.

Based on the foregoing, Vega's retaliation claim under Law 115 survives summary judgment *only* with respect to his claim that his termination resulted from his requests for military protected leaves.

3.     Hostile Work Environment under USERRA

Vega alleges that beginning in 2016, when Ortiz became his supervisor, he was subjected to a hostile working environment in violation of USERRA because of the discriminatory comments made by Ortiz allegedly related to his status as a servicemember and resulting military service.

On its face, USERRA "does not specifically prohibit an employer from subjecting an employee to harassment or a hostile work environment due to the employee's military status." *Figueroa Reyes v. Hospital San Pablo del Este*, 389 F. Supp. 2d 205 (2005) (quoting *Vickers v. City of Memphis*, 368 F. Supp. 2d 842, 844 (W.D. Tenn. 2005)). Having said that, however, neither the Supreme Court nor the First Circuit have decided whether hostile work environment claims are cognizable under USERRA. *See Vega-Colon v. Wyeth Pharmaceuticals*, 625 F.3d 22 (1st Cir. 2010); *Billerica Police Dep't*, 679 F. Supp. 2d 218 (D. Mass. 2010). Nevertheless, for purposes of this discussion, the

---

[37] If, however, Vega cannot establish in due course that requesting military protected leave indeed constitutes protected conduct under Law 115, this claim will also be dismissed.

Court will assume, without deciding, that hostile work environment claims are actionable under USERRA.

To establish his hostile work environment claim, Vega "must show harassing behavior *sufficiently severe or pervasive to alter the conditions of [his] employment*." *See Vega-Colon*, 625 F.3d 22 (citing *Pennsylvania State Police v. Suders*, 542 U.S. 129, (2004)) (internal quotations omitted). He must also establish that "the offending behavior . . . create[s] an abusive working environment." *Id.* at 146–147, (internal citation omitted). "In characterizing the negative workplace environment, courts have drawn a continuum between rudeness and ostracism, on one side of the spectrum, and severe or pervasive harassment on the other side, generally finding that rudeness or ostracism, standing alone, is insufficient to support a hostile work environment claim and that severe or pervasive harassment is actionable." *Figueroa Reyes v. Hospital San Pablo Del Este*, 389 F. Supp. 2d 205 (D.P.R. 2005) (citing *Noviello v, City of Boston*, 398 F.3d 76 (1st. Cir. 2015); *Simas v. First Citizens' Fed. Credit Union*, 170 F.3d 37, 52 n.12 (1st Cir. 1999)) (internal quotations omitted). The harassment must be both objectively and subjectively offensive. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998).

There is no "mathematically precise test" for determining when conduct in the workplace moves beyond the "merely offensive" and enters the realm of unlawful discrimination. *Marrero v. Goya of Puerto Rico, Inc.*, 304 F.3d 7, 18–19 (1st Cir. 2002) (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)). Rather, the question of whether the environment is objectively "hostile or abusive" must be answered by reference to "all the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. Behavior that is not objectively "severe, physically threatening, or humiliating" is insufficient to establish such a claim. *Vega-Colon*, 625 F.3d at 22.

In this case, to support his claim that he was subjected to a hostile working environment, Vega relies heavily on negative and derogatory comments allegedly made by Ortiz related to his military service and his multiple requests for military leave and related absences. According to Vega, Ortiz complained about each of Vega's leave

requests to attend military exercises and referred to them as a "problem." Vega claims that such comments were "frequent." He also claims that he would often request assistance from Ortiz to help him with his workload and that Ortiz would say something to the effect of: "Aren't you in the army?" Taking all inferences in Vega's favor, and assuming these comments were made, overall, the Court finds that on this record the conduct described by Vega more closely resembles "rudeness and ostracism" and "offensive utterances" rather than sufficiently severe or pervasive workplace harassment that is actionable.

Vega points to what appears to be undesirable offhand comments allegedly made by his supervisor Ortiz. Vega however did not show that such conduct was severe, physically threatening, or humiliating. Moreover, the record does not show that Vega was ever called any derogatory names, nor that he was ever subjected to any significant degradation because of his protected military status. *See Vega-Colon,* 625 F.3d 22 (1st Cir. 2010) (finding that even infrequent negative comments in addition to regular name-calling regarding military status were *not* sufficient for hostile work environment claim). *See, e.g., Chamberlin v. 101 Realty, Inc.,* 915 F.2d 777, 783 (1st Cir. 1990) (expressing doubt as to whether five sexual comments made over the course of a four to five-week period constituted harassment severe and pervasive enough to create a hostile work environment). As the First Circuit has observed elsewhere, "[t]he workplace is not a cocoon, and those who labor in it are expected to have *reasonably* thick skins." *Suarez v. Pueblo Int'l, Inc.,* 229 F.3d 49, 54 (1st Cir. 2000); *Marrero v. Goya of Puerto Rico, Inc.,* 304 F.3d 7, 19 (1st Cir. 2002). Because workplaces are rarely idyllic, employees must learn to tolerate "simple teasing, offhand comments, and isolated incidents (unless extremely serious)." *Faragher,* 524 U.S. at 778 (internal quotation marks and citation omitted). Based on the circumstances presented here, viewed objectively, the comments directed at Vega were not, in this Court's opinion, severe.

Regarding the frequency of the comments, Vega broadly claims that they were quite frequent, even going as far as claiming that they occurred "every day," but his evidence suggests otherwise. In his deposition testimony, for instance, Vega stated that the comments were made each time he had to go on military leave, which, per Vega's

own deposition testimony, occurred approximately 10 times a year. Taking that as true, 10 comments a year is certainly more indicative of occasional instances of rudeness and ostracism than frequent "harassment." On the whole, the necessary "pervasive" element has not been met here either. Furthermore, Vega neither alleged nor pointed to evidence from which a jury could conclude that the allegedly harassing conduct unreasonably interfered with his work performance or that it altered the conditions of his employment. *See Vega-Colon,* at 32-33. There is not an inkling of evidence on this record that Ortiz' negative comments affected Vega's work performance in any way.

Furthermore, although the comments regarding Vega's military status may have been subjectively offensive to him, in the Court's opinion, they neither amounted to objectively offensive conduct nor sufficiently severe or pervasive harassing behavior that altered the conditions of Vega's employment. And while such comments are clearly unjustified, and show a lack of education, empathy, and basic human decency, there is no basis on this record for a reasonable fact-finder to conclude that Vega was subjected to a hostile work environment as it is defined by law. Accordingly, Vega has not met his burden of showing that the harassing behavior complained of was sufficiently severe or pervasive and, therefore, Vega has failed to show even a baseline claim of an "abusive working environment" sufficient to establish a plausible hostile work environment claim. *See Pennsylvania State Police,* 542 U.S. at 147 (internal quotation marks and citation omitted).[38]

Based on the foregoing, the Defendant is entitled to summary judgment on Vega's hostile work environment claim under USERRA. *See Vega-Colon,* 625 F.3d 32-33 (granting summary judgment on plaintiff's hostile work environment claim under USERRA). Thus, such claim is **DISMISSED with prejudice**.

---

[38] The Court recognizes that the First Circuit has noted that because the inquiry into the existence of a hostile work environment is fact specific, "the determination is often reserved for a fact finder." *Pomales,* 447 F.3d at 83. Notwithstanding that, however, "summary judgment is an appropriate vehicle for 'polic[ing] the *baseline* for hostile work environment claims.'" *Id.* (quoting *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1244 (11th Cir.1999) (en banc))(alteration in original). Here, Vega did not meet the requisite initial threshold.

4.   Wage and hour claim under the Fair Labor Standards Act ("FLSA")

The FLSA provides employees protection from low wages and long hours. It requires employers to pay employees overtime for hours worked in excess of forty (40) hours per week at a rate not less than one and one-half times an employee's regular rate for each overtime hour worked. 29 U.S.C. § 207(a)(1); *Mercado-Rodriguez v. Hernandez Rosario*, 150 F.Supp. 3d 171 (D.P.R. 2016) (citing *De Jesús–Rentas v. Baxter Pharmacy Servs. Corp.*, 400 F.3d 72, 74 (1st Cir. 2005)).

Vega maintains that he is entitled to overtime pay under the FLSA because he: (1) worked 10-hour workdays; and (2) was unable to take his lunch break. The Defendant challenges Vega's allegations and argues that Vega's claims under the FLSA must be dismissed under Fed. R. Civ. P. 12(c) based on the insufficiency of the pleadings.[39]

In this case, the Court carefully examined the Complaint to ascertain whether the allegations related to an FLSA claim meet the requisite pleading standard to survive dismissal under Rule 12(c), which is treated much like Rule 12(b)(6). The Complaint alleges that Vega did *not* have a fixed schedule but that he typically began his shift around 8:00AM, that he was not allowed to take a one-hour lunch break, and that he did not have a specific time to finish his working shift, resulting in 10-hour workdays. (Docket No. 1, ¶¶3, 4 at page 3 and page 9). In the four corners of the complaint, however, it is not alleged *anywhere* that Vega worked a workweek that exceeded 40 hours, the statutory minimum to trigger the FLSA overtime compensation requirements.

In *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.,* 632 F.3d 762, 771 (1st Cir. 2011), the First Circuit discussed the pleading requirements to state a plausible claim:

> [t]o state a claim, the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

[39] The Defendant does not seek the dismissal of Vega's FLSA claims pursuant to Fed. R. Civ. P. 56, under which it premises its motion for summary judgment. The Court is puzzled by the Defendant's inclusion of a motion for judgment on the pleadings pursuant to Rule 12(c) embedded in its motion for summary judgment. At the very least, the Defendant should have submitted this motion separately. In any event, for judicial economy, the Court will resolve this matter as requested by the Defendant.

_____

> on its face,' " *Ashcroft v. Iqbal,* [556] U.S. [662], 129 S.Ct. 1937,
> 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v.*
> *Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929
> (2007)); "'naked assertions devoid of further factual enhancement'
> " need not be accepted, *Maldonado v. Fontanes,* 568 F.3d 263, 266
> (1st Cir.2009) (quoting *Iqbal,* 129 S.Ct. at 1949); and "[i]f the
> factual allegations in the complaint are too meager, vague, or
> conclusory to remove the possibility of relief from the realm of
> mere conjecture, the complaint is open to dismissal," [*SEC v.*
> *Tambone,* 597 F.3d 436, 442 (1st Cir. 2010) (en banc)].

*See Pruell v. Caritas Christi*, 678 F.3d 10, 13 (1st Cir. 2012).

At first glance, viewing the pleadings in the light most favorable to Vega, the Court finds that his pleadings are insufficient to state a claim under the FLSA that is plausible on its face. To state a valid claim under the FLSA, Vega had to allege that: (1) he was employed by the defendant; (2) his work involved interstate activity; and (3) he performed work for which he was under-compensated. 29 U.S.C. §§ 206(a), 207(a)(1); *Pruell*, 678 F.3d at 11 (1st Cir. 2012); *Manning v. Boston Medical Center Corp.*, 725 F.3d 34 (1st Cir. 2013). A claim for unpaid overtime wages must "demonstrate that the plaintiffs were employed 'for a *workweek longer than forty hours'* and that any hours worked in excess of forty per week were not compensated 'at a rate not less than one and one-half times the regular rate.'" *Id.* (quoting 29 U.S.C. § 207(a)(1)).

In *Pruell v. Caritas Christi,* 678 F.3d 10, 14 (1st Cir. 2012), the First Circuit affirmed a judgment finding that a complaint was inadequate to state an FLSA claim under Rule 12(b)(6) given the lack of any information on plaintiffs' approximate weekly wages and hours worked. The First Circuit noted that, like here, there was not even an allegation that plaintiffs had worked in excess of forty hours in any workweek. The First Circuit also found that the complaint "d[id] not provide examples (let alone estimates as to the amounts) of such unpaid time for either plaintiff nor did it describe the nature of the work performed during those times" and there was nothing to show that the plaintiffs were in fact under-compensated. The Court follows the First Circuit's reasoning and holding because Vega's omissions in the Complaint here are the same as those found in the plaintiff's complaint in the *Pruell* case. The Court explains.

_____

As to the first element, to allege an employment relationship, Vega states that he started working for the Defendant on November 2008 as a Merchandiser. (Docket No. 1, ¶2). As such, this element is met. Notwithstanding, Vega falls well short of meeting the second and third elements for asserting a valid FLSA claim. Regarding the second element, there is no allegation in the Complaint that Vega's work involved interstate activity, therefore this element is not met.

Now, turning to the third element—that Vega performed work for which he was under-compensated—Vega's allegations are insufficient to meet this element for numerous reasons. First, there is not one allegation in the Complaint to state that Vega had worked in excess of 40 hours in any given workweek, a prerequisite to state a valid FLSA claim. More specifically, the Complaint only states that Vega worked 10 hours per day, but nowhere does it provide information about his *daily* schedule. The Complaint only says that Vega's shift started at 8:00AM, but it is silent as to the time it ended. Also missing from the Complaint is any information regarding Vega's *weekly* schedule. There is simply no information regarding how many days a week Vega worked. The Complaint, for example, does not state that Vega worked 5 days a week. What is more, given this complete lack of information, the fact that Vega alleges that he did *not* have a fixed schedule makes it impossible for the Court to reasonably infer that Vega worked more than 40 hours during a workweek, without entering into the forbidden realm of speculation and guesswork. As the Defendant correctly argues, it is possible under a variety of scenarios for Vega to have worked 10-hour days but *not* have worked more than 40 hours per week. Vega's omissions cost him dearly because the Court cannot even draw a reasonable inference as to the hours Vega worked in a given week.

Second, there is no information of any kind in the Complaint about Vega's approximate weekly wages, nor any examples or estimates as to the amounts of the unpaid time that is allegedly owed to him. The Complaint also omitted any mention or information on the type of work that Vega allegedly conducted for which he was under-compensated. Third, there is no allegation in the Complaint that the alleged overtime requested by Vega is time compensable under the FLSA. Fourth, the Complaint also

_____

fails to state that Defendant had actual or constructive knowledge that Vega was performing uncompensated work. "Work not requested but suffered or permitted is work time" if "[t]he employer *knows or has reason to believe* that [the employee] is continuing to work." 29 C.F.R. § 785.11. The Defendant's actual or constructive knowledge that Vega was performing work for which he was undercompensated is a necessary condition of an FLSA claim because it would allow the Court to find that Defendant "permitted" Vega's overtime work. There is no allegation in the Complaint that Defendant knew or should have known that Vega was working overtime with no compensation.

In sum, all these omissions are fatal to Vega's cause. Because Vega's Complaint is inadequate to state a plausible FLSA overtime claim, such cause of action must be dismissed.

Finally, regarding Vega's allegation that he was not allowed to take a one-hour lunch break, the Court makes clear that the FLSA does not regulate meal breaks nor require that employers give them. The FLSA does however require that employers pay employees who performed compensable work during meal breaks. To state a valid claim for meal period compensation, Vega had to allege that he performed compensable work during his meal period and that Defendant knew or should have known about it. There are no such allegations in Vega's Complaint.

Based on the foregoing, because of the insufficiency of the allegations in the Complaint, Vega's pleadings are not enough to raise his right to relief above the speculative level. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In this case, the factual allegations in the Complaint are so poor that they do not meet the requisite pleading standards to state a plausible FLSA claim. Accordingly, the Court finds that the allegations in the Complaint are insufficient to state a valid claim under the FLSA. The Court thus **GRANTS** Defendant's request to dismiss Vega's FLSA claims pursuant to Fed. R. Civ. P. 12(c). Vega's FLSA claims are **DISMISSED.**

### a.     Wage and Hour claim under Puerto Rico Law 379

Identical to his FLSA claim, Vega also asserts a claim for alleged work performed during overtime and during his meal period under Puerto Rico Law 379. Law 379 regulates working hours, days, overtime calculations, and compensation. P.R. Laws

Ann. tit. 29, §§ 271-288 *et seq.* Similar to the FLSA, Law 379 states, in pertinent part, that "forty hours of work constitute a workweek," P.R. Laws Ann. tit. 29 § 271, "extra working hours are . . . hours that an employee works for his employer in excess of forty during any week," §273(b) and "[e]very employer who employs or permits an employee to work during extra hours, shall be bound to pay him for each extra hour a wage rate equal to double the rate agreed upon for regular hours," § 274. *Pages-Cahue v. Iberia Lineas Aereas de Espana*, 82 F.3d 533, 540 (1st Cir. 1996). Under Law 379, employers must also provide employees with a meal period, and an employer who requires or permits an employee to work during his meal period must compensate him at double his regular hourly rate. *Id.* § 283.

Law 379 largely mirrors the compensation regulations of the FLSA. *See, e.g., Velázquez Fernandez v. NCE Foods, Inc.*, 405 F. Supp. 2d 179, 195–96 (D.P.R. 2005) (analyzing Law 379 and FLSA under the same framework). *See also Rossello v. Avon Prod., Inc.*, No. CIV. 14-1815 JAG/BJM, 2015 WL 3890403, at *2 (D.P.R. June 24, 2015), report and recommendation adopted, No. CIV. 14-1815 JAG, 2015 WL 5693018 (D.P.R. Sept. 28, 2015) (Law 379 parallels and supplements the FLSA).[40]

Here, the Court carefully analyzed the pleadings in the light most favorable to Vega and found that they are insufficient to state a plausible claim under the FLSA. Because Vega's claims for overtime compensation under Law 379 mimic his FLSA claims and are premised on the same poorly pled and inadequate factual allegations, Vega has also failed to assert sufficient factual allegations to support a valid claim under Law 379. As Law 379 largely mirrors the compensation regulations of the FLSA, and both laws are analyzed under the same framework, Vega's claims under Law 379 must suffer the same fate as his FLSA claims. *See e.g., Velázquez Fernandez,* 405 F. Supp. 2d at 195–96 (analyzing Law 379 and FLSA under the same framework); *Perez-Maspons v. Stewart Title Puerto Rico, Inc.,* 208 F. Supp. 3d 401, 424 (D.P.R. 2016) (granting

---

[40] It is also appropriate for courts to look to the FLSA case law and regulations when interpreting the Law 379 exemptions. *Velazquez Fernandez v. NCE Foods, Inc.,* 405 F. Supp. 2d 179, 195–96 (D.P.R. 2005), *aff'd,* 476 F.3d 6 (1st Cir. 2007); *See Pages–Cahue v. Iberia Lineas Aereas de Espana,* 82 F.3d 533, 542 (1st Cir. 1996); *see Rodríguez v. Concreto Mixto, Inc.,* 98 P.R.R. 568, 575–76, 1970 WL 23837 (P.R.1970).

_____

summary judgment as to plaintiff's Law 379 claim where plaintiff failed to assert a claim under the FLSA and did not set forth any facts to support a Law 379 claim).

Accordingly, the Court **GRANTS** Defendant's request to dismiss Vega's Law 379 claims pursuant to Fed. R. Civ. P. 12(c) and **DISMISSES** such claims.

### 5.   Wrongful discharge: Puerto Rico Law 80

To conclude, Vega claims that he was wrongfully discharged in violation of Puerto Rico Law 80 of May 30, 1976, as amended, P.R. Laws Ann. tit. 29, §§ 185a–185m. Law 80, Puerto Rico's wrongful termination statute, provides relief to employees terminated "without good cause." P.R. Laws Ann. tit. 29, § 185a. In other words, Law 80 requires employers to compensate at-will employees who are discharged without just cause. *Ruiz–Sanchez v. Goodyear Tire & Rubber Co.*, 717 F.3d 249, 254 (1st Cir.2013). Section 185b of Law 80 gives examples of "good cause" for termination and further provides that a termination which is "made by the mere whim of the employer or without cause relative to the proper and normal operation of the establishment" is not a termination for "good cause." *Velazquez Fernandez v. NCE Foods, Inc.*, 405 F. Supp. 2d 179, 192 (D.P.R. 2005), *aff'd*, 476 F.3d 6 (1st Cir. 2007); P.R. Laws Ann. tit. 29 § 185b (2003). Under Law 80, an employee bears the initial burden of alleging unjustified dismissal and proving actual dismissal. If the employee satisfies this burden, then the employer must prove, by a preponderance of the evidence, that it discharged the employee for "good cause." *Alvarez–Fonseca v. Pepsi Cola of P.R.*, 152 F.3d 17, 28 (1st Cir. 1998).

Here, C&S dismissed Vega in April 2018 and Vega claims that his dismissal was unjustified and without "good cause" because his membership in the military and his related military absences were the *de facto* reasons for his termination. C&S denies Vega's contentions, claiming that Vega's dismissal was lawful because it stemmed from the "Costco incident" in April 2, 2018, wherein Vega violated several company policies and engaged in dishonest conduct, all of which warranted his immediate termination.

The statute provides a non-exhaustive list of circumstances that may constitute just cause for termination, including, among others, that the employee "indulges in a pattern of improper or disorderly conduct" or engages in repeated violations of the

_____

employer's reasonable rules and regulations. P.R. Laws Ann. tit. 29 § 185b. Indeed, courts have found that "good cause" for termination exists where an employee violated an employer's internal procedures. *Vargas v. Royal Bank of Canada*, 604 F.Supp. 1036 (1985), and where an employee failed to follow rules and supervisory instructions, *Menzel v. Western Auto Supply Co.*, 662 F. Supp. 731 (1987). "Law 80 does not invariably require repeated violations, particularly where an initial offense is so serious, or so reflects upon the employee's character, that the employer reasonably should not be expected to wait for further occurrences." *See Gonzalez v. El Dia, Inc.*, 304 F.3d 63 (1st Cir. 2002) citing *Delgado Zayas v. Hosp. Interamericano de Medicina Avanzada*, 137 D.P.R. 643, 650 (1994). Notwithstanding that, termination as a penalty for a single offense, as appears to be the case here, is allowed only in exceptional circumstances, and must not "reflect arbitrariness or whim of the employer." *See Secretario del Trabajo v. I.T.T.*, 8 P.R. Offic. Trans. 564, 568–569, 108 D.P.R. 536 (1979). The analysis is very fact-intensive and involves multiple variables, including the nature of the offense and the effect it may have in the "proper and normal operation of the enterprise," the employers' rules and regulations, and the employee's years of service. *Id.* at 578, 108 D.P.R. 536 (J. Negrón–García, dissenting). *Ramos-Santiago v. WHM Carib, LLC*, No. CV 14-1087 (SEC), 2017 WL 1025784, at *5-6 (D.P.R. Mar. 14, 2017), *aff'd,* 919 F.3d 66 (1st Cir. 2019), and *aff'd,* 919 F.3d 66 (1st Cir. 2019), and *aff'd,* 919 F.3d 66 (1st Cir. 2019). "In practice, these factors often tug strongly in opposite directions." *Id.*[41]

_____

[41] For example, while an employer may justly discharge an employee with seven months of employment for the single offense of lying about his criminal history in the employment application, *see Autoridad de Edificios Públicos v. U. I. E.*, 130 D.P.R. 983 (1992), P.R. Offic. Trans., it cannot do the same to an employee having a clean disciplinary record during a seventeen-year tenure for lying to get a leave of absence. *See Secretario del Trabajo*, 8 P.R. Offic. Trans. 564, 108 D.P.R. 536. In the latter case, the Puerto Supreme Court found that the employer's rule allowing dismissal for a single incident of lying was unreasonable. *See id.* at 572–573, 108 D.P.R. 536.

The severity of the offenses also modifies the analysis significantly. "Major offenses," need not be in the employer's regulations to allow for lawful termination because "a person of normal intelligence has to know" that, for example, stealing "[c]onstitute[s] a major or serious offense [that] he must not ever commit." *Miranda Ayala v. Hospital San Pablo*, 170 D.P.R. 734, 741 (2007) (affirming dismissal of an employee who had stolen two cases of spoiled beer and denied it until he was confronted with a video showing the theft).

_____

Here, the Defendant claims that it terminated Vega for "just cause" and there is evidence on the record tending to show that Vega violated official company policy and procedures and was indeed caught lying to the company with respect to the incident that allegedly caused his eventual dismissal. Nevertheless, the Defendant cannot prevail on this claim on summary judgment because, as discussed in the USERRA discrimination and retaliation analysis, Vega has presented triable issues of fact that cast doubt on the Defendant's proffered reason for terminating Vega.

Accordingly, Vega's wrongful termination claim survives summary judgment because the record reveals genuine issues of material fact which must be resolved by the fact-finder. When a genuine issue of material fact exists as to whether plaintiff's termination was retaliatory or discriminatory, like here, a claim under Law 80 survives summary judgment. *Collazo v. Bristol–Myers Squibb Mfg., Inc.*, 617 F.3d 39, 53 n.10 (1st Cir. 2010). In addition, whether Vega's actions fall within Law 80's exception permitting discharge for a single offense is a mixed question of law and fact better left to the jury. *Ramos-Santiago*, No. CV 14-1087 (SEC), 2017 WL 1025784, at *5–6. *See Hana Fin., Inc. v. Hana Bank*, —— U.S. ——, 135 S. Ct. 907, 911, 190 L. Ed. 2d 800 (2015) ("the application-of-legal-standard-to-fact sort of question . . ., commonly called a 'mixed question of law and fact,' has typically been resolved by juries.") (quoting *United States v. Gaudin*, 515 U.S. 506, 512 (1995)).

Based on the foregoing, Vega's Law 80 claim for unjust termination survives dismissal and, therefore, the Defendant's motion for summary judgment on this claim is **DENIED**.

### 3.   <u>Conclusion</u>

For the reasons set forth above, the Court **GRANTS in part** and **DENIES in part** C&S's motion for summary judgment at Docket Nos. 94-95. The claims that survived summary judgment are the following: Vega's discrimination and retaliation claim under USERRA with respect to his employment termination only, Vega's retaliation claim under Law 115 with respect to his claim that his termination resulted from his requests for military protected leaves only, and Vega's wrongful discharge claim under Law 80. All other claims are **Dismissed with prejudice.**

_____

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 6th day of August 2020.


*__s/Marshal D. Morgan__*

MARSHAL D. MORGAN
United States Magistrate Judge